UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>ZIMMER M/L TAPER HIP PROSTHESIS OR M/L TAPER HIP PROSTHESIS WITH KINECTIV TECHNOLOGY AND VERSYS FEMORAL HEAD PRODUCTS LIABILITY LITIGATION<br><br>*This Document Relates to McMillan v. Zimmer US Inc. et al., 20-CV-2358 (JMF)* | 18-MD-2859 (JMF)<br>20-CV-2358 (JMF)<br><br><u>OPINION AND ORDER</u> |

JESSE M. FURMAN, United States District Judge:

This product liability action is one of last cases in a multi-district litigation ("MDL") involving a hip prosthesis manufactured by Defendants Zimmer, Inc. and Zimmer US, Inc. (collectively "Zimmer") called the M/L Taper with Kinectiv femoral stem and neck (the "Kinectiv"). In 2009, the device was implanted in Plaintiff Dennis McMillan during total hip replacement surgery. Approximately six years later, it fractured while McMillan was walking down a hill, requiring painful and complicated revision surgery. McMillan contends that the fracture occurred because of a defect in the Kinectiv and, to support that contention — and his claims in this case — he proposes to call as an expert witness the surgeon who performed his revision surgery. Zimmer now moves, pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to preclude McMillan's surgeon from testifying and moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment. For the reasons that follow, the Court agrees that McMillan's surgeon's opinions are insufficiently reliable to pass muster and, thus, must be excluded. But whether those opinions are considered or not, McMillan fails to proffer sufficient evidence to support his claims. Accordingly, and for the reasons that follow, Zimmer's motions are granted.

**BACKGROUND**

The following facts are drawn from the materials submitted by the parties and — unless otherwise noted — are either undisputed or described in the light most favorable to McMillan. *See, e.g.*, *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

Zimmer manufactures hip prostheses, including the Kinectiv, to be used during total hip replacement surgery. ECF No. 95-1 ("SOF"), ¶ 7. The Kinectiv differs from traditional hip stems used in primary hip replacements in that it is "modular," meaning that the femoral stem contains separate neck and stem components. *Id.* ¶ 8. On August 10, 2009, McMillan, then forty-four years old, underwent a left total hip replacement surgery, during which Dr. James Kipnis implanted a hip replacement system consisting of the Kinectiv; a femoral head; and a Trilogy acetabular cup and liner. SOF ¶¶ 4-7; ECF No. 99-3 ("Boraiah Rep."), ¶ 10. The surgery itself was uneventful, SOF ¶ 17, and for approximately six years, McMillan ambulated and functioned normally, without mechanical symptoms or hip pain. *Id.* ¶¶ 19-20; ECF No. 110-1 ("McMillan Dep. Tr."), at 65-70. He was able to engage in physical activity, including basketball, bowling. and cycling. McMillan Dep. Tr. 65-66.

In August 2015, however, McMillan was walking down a hill with his daughter when he felt a sudden "snap" in his left hip, causing immediate pain and inability to walk. McMillan Dep. Tr. 132-33; ECF No. 96-8 ("Boraiah Operative Note"), at 2. Imaging confirmed a fracture of the modular neck of the prosthesis. SOF ¶ 31. On August 26, 2015, Dr. Sreevathsa Boraiah performed a complex revision surgery and concluded that the Kinectiv in McMillan's hip replacement device had incurred a catastrophic fracture. Boraiah Rep. ¶ 12. During the surgery, Dr. Boraiah observed that the modular neck had fractured at or near the neck-stem junction and that the neck and stem were cold-welded such that the neck could not be disengaged using

standard techniques. *Id.* ¶¶ 12-13. As a result, Dr. Boraiah resorted to a more invasive extraction method, called an "extended trochanteric osteotomy," which involved splitting a portion of the femur open to attempt extraction. *Id.*; Boraiah Operative Note 2-3. Thereafter, Dr. Boraiah implanted a different hip replacement device. SOF ¶ 34; Boraiah Operative Note 2, 4. After the revision surgery, however, McMillan experienced significant discomfort. SOF ¶ 47; Boraiah Rep. ¶ 13. The complications during the revision surgery resulted in leg-length discrepancy, altered gait mechanics, and secondary pain in the contralateral hip and lumbar spine. Boraiah Rep. ¶ 33.

McMillan filed this lawsuit on July 10, 2018. ECF No. 1-1. He brings negligence, breach of express warranty, and breach of implied warranty claims. *Id.* ¶¶ 11-26. In support of these claims, he seeks to call Dr. Boraiah — a board-certified orthopedic surgeon, with fifteen years of experience doing hip reconstructions, who currently serves as Chief of Adult Reconstruction at Long Island Jewish Hospital — as an expert witness. *See* Boraiah Rep. ¶ 1; ECF No. 109-8 ("Boraiah CV"). In his report, Dr. Boraiah offers three relevant opinions: first, that "the Zimmer modular neck component was a defective design and was manufactured in a defective manner, which directly caused it to fracture," Boraiah Rep. ¶ 17; second, that "the Zimmer modular neck component was manufactured in a defective manner, which directly caused it to cold weld into the Zimmer modular stem," *id.* ¶ 23; and third, that the "Zimmer modular neck component was negligently designed because although some corrosion is normal and expected in implants, the device was not adequately engineered to withstand real-world biomechanical loads," *id.* ¶ 26. As noted, Zimmer moves to preclude Dr. Boraiah from testifying and moves for summary judgment on all of McMillan's claims.

## MOTION TO PRECLUDE EXPERT TESTIMONY

The Court begins with Zimmer's motion to preclude Dr. Boraiah's expert testimony because it bears on Zimmer's motion for summary judgment.

### A. Applicable Legal Standards

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which, as amended in 2023, provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if "the proponent demonstrates to the court that is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Rutledge v. Walgreen Co.*, — F. 4th — No. 24-1121, 2026 WL 2015284, at *9-10 (2d Cir. July 13, 2026). In *Daubert*, the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "This standard requires district courts to look carefully at the qualifications and methodology of each expert." *Rutledge*, 2026 WL 2015284, at *9.[1]

[1] The 2023 amendments clarified that the preponderance standard governs all admissibility criteria, thus reaffirming the importance of the court's gatekeeping function. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The amendments were intended to correct a line of cases in which courts had improperly treated the sufficiency of an expert's factual basis and the reliability of the expert's methodology as questions of weight for the jury, rather than as threshold questions of admissibility for the court. *Id.*; *see also Rutledge*, 2026 WL 2015284, at

The focus of the Court's analysis under Rule 702 "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Ultimately, "expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted). Relatedly, a court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). By contrast, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21 (internal quotation marks omitted). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

**B. Discussion**

Applying these standards, and assuming without deciding that Dr. Boraiah is qualified to testify as an expert, the Court concludes that Zimmer's motion must be granted.

For starters, Dr. Boraiah offers no reliable basis for his opinion that the Kinectiv had a design or manufacturing defect beyond the fact that the device fractured. *See* ECF No. 99-4 ("Boraiah Dep. Tr.") 87 ("Q. In your mind, is the fact that Mr. McMillan's device fractured the sole basis for your opinion that the product must have had a defect? A. Design and manufacturing, yeah."); *id.* at 233 ("Q. Okay. So what is it about the [Kinectiv] modular neck design that makes it defective? A. It broke."); *id.* at 247 ("[I]t should not have broken, but it is

---

*16 n.25 (observing that the amendments "sought to correct the 'hands-off' approach to expert testimony that the Rules Committee perceived had been applied by many district courts.").

broken so there's a reason"). He failed to review, identify, or cite any underlying data, literature, or methodology to validate his opinion that a defect caused the fracture. *See* Boraiah Report; Boraiah Dep. Tr. 40-43, 58, 77-79, 230. Nor did he review, let alone cite, any Zimmer documents regarding the design history of the Kinectiv. *See* Boraiah Dep. Tr. 64-65, 82-83, 266-67. Most telling, Boraiah himself repeatedly admitted he cannot speak to why the device fractured, stating during his deposition, "I don't want to analyze why [the device] fractured because we will never know." Boraiah Dep. Tr. 131; *see also id.* at 240 ("So what went wrong? I can't comment on that."). To be sure, Dr. Boraiah "is to be commended for his candor in admitting that he does not know . . . how the [fracture] occurred." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 459 (S.D.N.Y. 2016). But "that admission shows" his opinion that the fracture was caused by a design or manufacturing defect "to be unreliable." *Id.*; *see also Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) (excluding expert opinion as to manufacturing defect where expert "essentially provided no explanation as to how he reached his conclusion that the rupture must have been caused by a manufacturing defect"); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 248-49 (S.D.N.Y. 2010) ("Expert testimony that is merely 'subjective belief or unsupported speculation' should be excluded." (quoting *Daubert*, 509 U.S. at 590)).

In response, McMillan argues that Dr. Boraiah's opinions are based on "[d]irect surgical inspection," which he characterizes as "the gold standard for assessing why an implant has failed." ECF No. 109 ("Pl.'s *Daubert* Mem."), at 9. But neither McMillan nor Dr. Boraiah himself explains how Dr. Boraiah's experience as an orthopedic surgeon allows him to reliably identify a defect just by looking at the device with his naked eye. *See Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 182 (E.D.N.Y. 2013) ("[A] treating physician may not offer an opinion — even one formed during the course of treatment — on specialized subjects. . . for which there is

no sufficiently reliable basis."); *see also, e.g.*, *Napolitano v. Synthes, Inc.*, No. 09-CV-828 (TLM), 2014 WL 12867042, at *3 (D. Conn. Apr. 9, 2014) (excluding testimony of the plaintiff's treating surgeon on the existence of a defect, explaining that his experience "as a surgeon . . . [did] not transform [him] into a biomedical engineer, human factors expert, or a metallurgist and [did] not provide him with qualifications to support his opinion on the safety of the [product's] design . . . or the reasons behind [its] breakage"). In the alternative, McMillan asserts that Dr. Boraiah "employed a classic differential diagnosis, . . . a method the Second Circuit has repeatedly recognized as reliable." Pl.'s *Daubert* Mem. 9 (citing *Zuchowicz v. United States*, 140 F.3d 381, 387-89 (2d Cir. 1998)). But nowhere in his report or deposition testimony does Dr. Boraiah himself use the term "differential diagnosis," let alone suggest that that was his method he used in forming his opinions. Moreover, "where an expert employs differential diagnosis . . . , he must also *rule in* the suspected cause, *and* do so using scientifically valid methodology." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (emphases added) (cleaned up). As discussed, Dr. Boraiah fails to meet that requirement.

In any event, Dr. Boraiah does not even reliably rule out other potential causes for McMillan's device's fracture, including corrosion and factors specific to McMillan, such as his age, weight, activity level, and implant positioning. As to the former, Dr. Boraiah conceded that all modular hip implants are susceptible to corrosion and that the presence of corrosion does not mean that a device is defective, *see* Boraiah Dep. Tr. 142; he acknowledged that he had performed no analysis of McMillan's Kinectiv to quantify the extent of corrosion and could not even see the relevant interfaces of the device to assess corrosion, *see id*. at 128-29; and he candidly admitted — more than once — that he could *not* exclude corrosion as a potential cause of the fracture, *see id.* at 132 ("As I sit here, I can say there was definitely something wrong that

made it break. Now, was it corrosion, fatigue, what percentage of what caused it? I don't know."); *id.* at 259 ("Q. Okay. So even though you think that [corrosion] likely is down the list, you can't exclude it entirely? A. Correct."); *see also id.* at 255, 256-57, 258-59. It is true that an expert need not "categorically exclude each and every possible alternative cause." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004). But Dr. Boraiah's failure to "adequately account[] for" corrosion as an "obvious alternative explanation[]" renders his opinions unreliable. *Id.*

As to the latter, Dr. Boraiah himself admitted that outcomes for total hip replacements can vary based on a mix of surgical, device, and patient factors, *see* Boraiah Dep. Tr. 97-98, 139-41, and that a patient's age, sex, weight, and physical activity level are relevant, *see id.* at 292-96. And yet, he performed no analysis of these factors, instead dismissing them — without explanation — as "irrelevant." *See id.* at 291-98. Making matters worse, Dr. Boraiah's testimony made clear that he was not even in a position to rule out factors specific to McMillan as a cause of the fracture because he lacked basic knowledge of the latter's age, weight, and activity levels, and he made no effort to determine the amount of force that would have been put on McMillan's device. *See id.* at 102, 103-05, 105-06, 114, 120-21. These admissions demonstrate that any opinions offered by Dr. Boraiah on alternative causes of the fracture would be impermissibly "speculative or conjectural." *Boucher*, 73 F.3d at 21; *see also, e.g.*, *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 252 (S.D.N.Y. 2018) (excluding an expert's opinions based in part on the fact that he "brush[ed] aside" relevant evidence), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020); *Morritt*, 973 F. Supp. 2d at 189-91 (excluding an

expert's differential diagnosis opinions because he could not and did not "reliably exclude certain alternative causes and . . . 'rule in' a manufacturing, material, or design defect").

In short, there is "simply too great an analytical gap" between Dr. Boraiah's opinions in this case and the data offered to support them. *Gen. Elec. Co.*, 522 U.S. at 146. Accordingly, Zimmer's motion to preclude him from testifying must be and is GRANTED.

**MOTION FOR SUMMARY JUDGMENT**

In light of the Court's exclusion of Dr. Boraiah's testimony, Zimmer is entitled to summary judgment. That is because, under New York law, expert testimony is required in "a complicated medical case . . . beyond the sphere of the ordinary juryman." *Fane v. Zimmer, Inc.*, 927 F.2d 124, 131-32 (2d Cir. 1991); *see also In re Mirena IUD Prods. Liab. Litig.*, 202 F. Supp. 3d 304, 310-11 (S.D.N.Y. 2016) (citing cases), *aff'd*, 713 F. App'x 11 (2d Cir. 2017); *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 218 F. Supp. 3d 700, 721 (N.D. Ill. 2016) ("[I]f an element of a claim requires expert testimony and that expert testimony is inadmissible under *Daubert*, the court must grant summary judgment on that claim."), *aff'd sub nom. In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*, 884 F.3d 746 (7th Cir. 2018). This case, involving a fractured orthopedic medical device, plainly qualifies. *See, e.g.*, *Fane, Inc.*, 927 F.2d at 131-32 (affirming the grant of directed judgment to the defendant in a case involving a fractured medical device due to the lack of expert testimony regarding causation); *Sura v. Zimmer, Inc.*, No. 15-CV-6719 (MAT), 2018 WL 1746533, at *2 (W.D.N.Y. Apr. 11, 2018), ("[A] plaintiff seeking to establish a design defect is required to provide expert testimony as to the feasibility and efficacy of alternative designs."), *aff'd,* 768 F. App'x 58 (2d Cir. 2019).

But Zimmer would be entitled to summary judgment on all of McMillan's claims even if Dr. Boraiah were permitted to testify.[2] For starters, McMillan abandoned his failure-to-warn and express-warranty and implied-warranty claims by failing to respond to Zimmer's arguments on those fronts. *Compare* ECF No. 95 ("Def.'s Mem."), at 18-25, *with* ECF No. 110 ("Pl.'s Mem."); *see* ECF No. 112 ("Def.'s Reply"), at 4; *see also, e.g.*, *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned."). That leaves only McMillan's negligence claim.[3] Implicitly conceding that he lacks sufficient direct evidence of a defect, McMillian relies exclusively on what is known as "malfunction theory" to support that claim. *See* Pl.'s Mem. 8. But under that theory, a plaintiff must prove, first, that the "incident that harmed" him was "of a kind that ordinarily occurs as a result of product defects" and, second, that the incident "was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution." *Speller ex rel. Miller v. Sears, Roebuck & Co.*, 100 N.Y.2d 38, 41-42

---

[2] Zimmer invites the Court to grant summary judgment on the grounds that McMillan does not properly respond to Zimmer's Local Civil Rule 56.1 Statement and "relies on information that finds no support in the record." ECF No. 112 ("Def.'s Reply") 3-4. McMillan's submissions are problematic in these ways, and the Court would indeed by on firm ground granting Zimmer's motion on that basis — all the more so because this is not the first time McMillan's submissions have fallen short. *See* ECF No. 108 (imposing sanctions on McMillan's counsel "for filing papers with AI-generated hallucinations and inaccuracies"). But the Court will not "punish Plaintiff for the shortcomings of [his] attorney." *Kiseleva v. Greenspan*, No. 23-CV-9496 (VEC), 2025 WL 3012188, at *1 (S.D.N.Y. Oct. 28, 2025); *see, e.g.*, *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 108 n.2 (2d Cir. 2005) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local rules" (cleaned up)).

[3] In his opposition, McMillan asserts that he should be permitted to proceed with his "strict liability . . . claims." Pl.'s Mem. 13. But McMillan's Complaint does not include any claim sounding in strict liability. It is well established that a plaintiff may not raise a new claim for the first time in his opposition to a summary judgment motion. *See, e.g.*, *Amaker v. Goord*, No. 98-CV-3634 (JGK), 2002 WL 523371, at *16 (S.D.N.Y. Mar. 29, 2002).

(2003) (quoting Restatement (Third) of Torts § 3 (A.L.I. 1998)); *see also Michael v. Gen. Motors Co.*, No. 15-CV-3659 (CM), 2018 WL 6332883, at *8 (S.D.N.Y. Nov. 13, 2018). McMillan's reliance on malfunction theory fails on both fronts.

First, the record is clear that fracture is a known risk for artificial hip devices and that it can occur for reasons having nothing to do with product defect. Indeed, Dr. Boraiah himself admitted that artificial hip devices can fail for reasons other than a defect, *see* Boraiah Rep. ¶ 7; Boraiah Dep. Tr. 138-39; and that, "[w]hen hip replacements do fail, the most common causes include fracture, loosening, infection, dislocation, wear of the artificial components, instability, leg length inequality, corrosion at modular junctions, inflammatory tissue reactions, and metal sensitivity," Boraiah Rep. ¶ 7. Additionally, McMillan's original surgeon, Dr. Kipnis, testified that "in orthopedics we see implants break . . . . [I]t's not uncommon . . . . [A]n implant can break anywhere." SOF ¶ 71; *see also id.* ¶ 99 ("Q. Were you aware of the risk at the time in 2009 of stem fracture in hip replacement? A. Yes. Q. It was a potential risk that was well-known to the orthopedic commun[ity] in 2009. Is that fair? A. Yes.").[4] "Where, as here, the plaintiff suffers the precise type of injury that is known to result from using the product, that fact precludes a jury from inferring that an injury would not have occurred had there not been a defect attributable to the manufacturer." *In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis with Kinectiv Tech. & VerSys Femoral Head Prods. Liab. Litig.*., No. 18-MC-2859 (PAC), 2021 WL 3475681, at *11 (S.D.N.Y. Aug. 6, 2021) (applying Idaho law). Second,

[4] Consistent with these opinions of McMillan's experts, Zimmer's experts cited medical literature and clinical data confirming that hip stem fractures, while rare, do occur. *See* ECF No. 109-4 ("Hanby Report"), at 12 n.19 (citing Bolland, B.J.R.F., et al., *An Analysis of Reported Cases of Fracture of the Universal Exeter Femoral Stem Prosthesis*, 32 The J. of Arthroplasty, 1318 (2017)); ECF No. 109-3 ("Ong Dep. Tr."), at 43-48; *see also* ECF 110-2 ("Hanby Dep."), at 105. And consistent with all of this evidence, the Instructions for Use for the Kinectiv device explicitly cited "fatigue fracture" as a known risk. *See* SOF ¶¶ 90-93.

and in any event, McMillan fails to "exclude all other causes for the product's failure that are not attributable to defendants." *Speller ex rel. Miller*, 100 N.Y.2d at 41. Indeed, as discussed above, Dr. Boraiah himself conceded that he could not rule out corrosion and factors specific to McMillan as causes of the fracture. As Dr. Boraiah candidly put it: "As I sit here, I can say there was definitely something wrong that made it break. Now, was it corrosion, fatigue, what percentage of what caused it? I don't know." Boraiah Dep. Tr. 132; *see also id.* at 131 ("I don't want to analyze why it fractured because we will never know."). In short, McMillan cannot rely on malfunction theory to support his negligence claims.

In sum, whether Dr. Boraiah's testimony is considered or not, the admissible evidence — even when viewed in the light most favorable to McMillan — demonstrates "no genuine dispute as to any material fact" and that Zimmer is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). Accordingly, Zimmer's summary judgment motion must be and is GRANTED.

**CONCLUSION**

For the foregoing reasons, Zimmer's motions to preclude Dr. Boraiah's testimony and for summary judgment are GRANTED. The Clerk of Court is directed to terminate ECF Nos. 94 and 97 in 20-CV-2358, to enter judgment for Zimmer consistent with this Opinion and Order, and to close 20-CV-2358.

SO ORDERED.

Dated: July 22, 2026
New York, New York

JESSE M. FURMAN
United States District Judge